**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **TULL BROTHERS, INC.,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **CIVIL ACTION NO. 12-00314-KD-M** |
| | ) | |
| **PEERLESS PRODUCTS, INC.,** | ) | |
| **Defendant.** | ) | |

**ORDER**

This matter came before the Court on June 10, 2013 for a hearing on Defendant's Motion

for Summary Judgment (Docs. 68-70),[1] Plaintiff's Response (Doc. 74), Defendant's Reply (Doc.

77), and the parties' supplemental briefing (Docs. 98-100); Plaintiff's Motion to Strike as to

Jones (Docs. 75, 76), Defendant's Response (Doc. 79) and Plaintiff's Reply (Doc. 86); and

Defendant's Motion to Strike as to Tull, Beers and design defects (Docs. 80-81), Plaintiff's

Response (Doc. 87) and Defendant's Reply (Doc. 90).

**I.    Findings of Fact[2]**

On May 16, 2012, subcontractor/window installer Plaintiff Tull Brothers, Inc. ("Tull

Brothers") initiated this litigation against window designer/manufacturer Defendant Peerless

Products, Inc. ("Peerless") for negligence, breach of express warranty, indemnity, and breach of

contract, relating to the installation of windows for the Engineering and Computer Science

Building ("Shelby Hall") at the University of South Alabama ("South Alabama") in Mobile,

Alabama. (Doc. 1). This litigation is rooted in a contract dispute over allegedly

---

[1] It appears that this motion for summary judgment has been inadvertently styled as a *partial* motion.
However, Peerless has moved for summary judgment on *all* four (4) of Tull Brothers' claims against it.  As such, all
of Tull Brothers' claims against Peerless are presently before the Court on summary judgment review.

[2] At the summary judgment stage, the facts are taken in the light most favorable to the non-movant - here,
the Plaintiff. Tipton v. Bergrohr GMBH–Siegen, 965 F.2d 994, 998-999 (11th Cir. 1992).

negligently/defectively designed windows with a 1-inch (versus 2-inch) high sub-sill "back leg."

Specifically, on August 26, 2009, South Alabama hired General Contractor Elkins Constructors, Inc. ("Elkins") to build Shelby Hall per a Construction Contract Agreement. (Doc. 74-20). On November 25, 2009, Elkins executed a Subcontract Agreement with Tull Brothers, for Tull Brothers to both purchase/supply and install over 800 fixed aluminum windows (for over 200 window openings), an impact curtain wall system, glass and glazing, for Shelby Hall, for the sum of $1,374,000. (Doc. 70-8). Tull Brothers' budget included 1,717 man hours and over $600,000 for the cost of the windows. (Doc. 70-26 at 2).

Tull Brothers, however, did not ultimately purchase and supply the windows to South Alabama. Instead, on October 27, 2010, per an Agency Agreement, Elkins on behalf of South Alabama (Purchaser) purchased the window materials directly from the manufacturer Peerless (Seller), for $623,021.00, per Purchase Order. (Doc. 70-9). The parties agree that this was done "to save on taxes." While Tull Brothers did not supply the windows, it remained Elkins' installation subcontractor and installed the windows that Peerless manufactured.

Each window opening in Shelby Hall consisted of four (4) Peerless fixed windows. (Doc. 70-10). The plans and specifications for the project required that the windows pass strict wind and water (*i.e.*, hurricane) resistance tests. (Doc. 74-23). Specifically, as part of the construction contract documents, the installed windows had to comply with an 8 pound per square foot field water test. This test consisted of an independent testing company (in this case Thompson Engineering, Inc. ("Thompson")) setting up a spray rack outside an installed opening[3] and setting up a vacuum on the interior to pull 8 pounds of pressure; the company would then

---

[3] As part of the construction contract documents, Tull Brothers was required to install a mock-up window for testing; however, the interested parties dispensed with that window and decided to use Tull Brother's first six (6) installed opening as "the mock-up" or pilot stage (testing four (4) of the six (6)).

spray a certain amount of water for 15 minutes while maintaining this pressure to simulate a rain event -- any water intrusion through the installed window system meant failure whereas a successful test meant the installed opening met project specifications.  (Id.)

When the windows were delivered, it was evident to Tull Brothers that the window systems required field assembly (more than anticipated): installing in each opening a vertical 6x6 tube, a horizontal mullion, the receptor system (comprised of sill, jamb and head components) and four (4) fixed windows.  (Doc. 70-37 (Dep. F. Tull at 13-14, 110-120)).  Specifically, the window sashes were delivered to the site "assembled" by Peerless but the sub-framing and mullion components were delivered in lengths, to be cut, assembled, and sealed, by Tull Brothers, who was then to install and seal the sashes into the sub-framing.  (Doc. 70-15 at 11 (Report of C.Matthews & C. Beers)).  Peerless' initial written instructions for installation and sealing of the assemblies were limited to the Peerless shop drawings and the general instructions from Peerless' website.  (Id.)  See also Doc. 70-29.  During the construction process, various site meetings were held and communications were exchanged between Peerless and Tull Brothers wherein Peerless explained upon and modified its initial sealing instructions for the sub-frames and the installation of the sashes onto those sub-frames. (Doc. 70-15 at 11 (Report of C.Matthews & C. Beers)).

As of February 25, 2011, Tull Brothers had discussed an issue with the window system back leg with Peerless (that the 1 inch subsill or back leg was too short).  (Doc. 70-34 at 25 (Dep. J.Roach at 112)).  On March 7, 2011, Tull began installation of the windows.  (Doc. 74-3).  On March 29, 2011, Peerless assured Tull Brothers that the height of the 1-inch subsill (back leg) was sufficient.  (Doc. 70-37 (Dep. F. Tull at 41-46)).

In April and May 2011, initial rounds of window field testing of the four (4) installed

openings revealed problems and resulted in "failures." (Docs. 70-2 and 70-3). On April 18, 2011, Thompson's test results revealed that a set of four (4) windows failed "by allowing water into the interior portion of the window sill. The window contractor and manufacturer spent time throughout the day breaking down one of the failed window assemblies to determine possible causes for the water entry. Thompson…personnel continued testing and was not present to fully observe their investigation." (Doc. 70-2 at 3). These four (4) windows were taken apart, remedial sealants were applied and they were readied for retesting. (Doc. 70-3 at 2).

On May 11, 2011, Thompson's test results revealed that the three (3) of these windows again failed, but at different locations, "by allowing water into the interior portion of the window sill. The window contractor/installers discussed the results of the…tests and concluded that there was no reason to continue on to the fourth window that had gone through the same remediation attempt as the three (3) previously tested." (Doc. 70-3 at 3; Doc. 70-23). Stephen Ward & Assoc., Inc. (USA's waterproofing expert providing recommendations to USA's representative SAG Group, as a consultant) noted that while the frame joinery was sealed in the shop by Peerless "this seal does not marry with the field seal at the back leg to the frame. This leaves a very narrow metal-to-metal joint open. When the sub-sill fills up with water as it appears to be doing, this narrow joint acts as a 'straw' due to the lower interior pressure during testing (or a storm)." (Doc. 70-23 at 1). "[T]he window manufacturer should respond with direction to the installer. Any remedial work that is deemed required for achieving performance shall be fully documented and is applicable to all similar windows." (Id.) SWA also requested a response from Tull Brothers and Peerless on the height of the sub-sill end dams. (Id.)

The parties dispute whether the deficiencies resulting in failures with testing were due to defective installation or a defectively designed window system (cf. Doc. 69 at 7 at ¶8-9 and Doc.

4

74 at 6 at ¶8).  In part, however, field testing revealed an unsealed joinery orifice that was the responsibility of Peerless.  (Doc. 69 at 7 at ¶9; Doc. 70-34 (Dep. J.Roach at 122-125)).  The orifice issue was eventually resolved.  (Doc. 74-15 (Dep. K.Ford at 32-34)).  Thompson noted that remedial sealants were applied "by a window manufacturer's representative" and were readied for further retesting.  (Doc. 70-4 at 2).  Additionally, as of the time of the failed mock-up, it was known that the sealant on the window system subsill (back leg) was a critical sealant joint.  (Doc. 70-35 (Dep. B.Smith at 75, 85-86)).

The four (4) windows were taken apart for a second time after failing the rests, remedial sealants were applied by a window manufacturer's representative, and the windows were made ready for the second round of retesting.  (Doc. 70-4 at 2).

On May 18, 2011, Thompson's test results (on the same set of four (4) windows) resulted in a score of "passed" and noted that "[a]fter remediation from a window manufacturer's representative…all four (4) tested windows passed…by preventing water from entering into the interior portion of the window sill."  (Doc. 70-4 at 2).  According to Kevin Ford, Tull Brothers' then glazing-superintendent, these four (4) passed tests showed that the Peerless window system met the contract documents and that Tull Brothers had a good and proper installation of those four (4) windows.  (Doc. 70-32 at 17 (Dep. K.Ford at 41)).  Barry Smith concluded that these passed tests reflected that Tull Brothers properly installed the windows and the Peerless window system performs to project specifications.  (Doc. 70-35 at 24 (Dep. B.Smith at 108)).  As such, Tull Brothers – duplicating the steps it took to obtain the passing test score -- began full-scale installation of the window systems at Shelby Hall.  (Doc. 74-10 (Dep. S.Williams at 47); Doc. 74-12 (Dep. R.Coody, at 56-57, 65, 131, 142)).

Subsequently, Tull Brothers found it very difficult to obtain consistency to pass tests due

to a blind seal required at the back leg of the window system.  (Doc. 70-37 (Dep. F.Tull at 101, 104)).  While Tull Brothers was aware of the blind seal at the back leg as of May 18, 2011, the installers did not realize "the perfection that was going to be required of that sealant until we actually started to install[,]" and "we were assured by Peerless that the system would adequately perform."  (Id. (Dep. F.Tull at 104-105)).

On June 9, 2011, Barry Smith of SWA declared that "[f]ield testing shows that the assembly can perform to project water penetration requirements, but only with diligent and specific work."  (Doc. 70-25; Doc. 70-35 (Dep. B.Smith at 10, 119-120)).  Smith explained that Peerless' window system could meet project specifications only after significant modifications not called for in Peerless' shop drawings and only if Tull Brothers made a perfect seal.  (Doc. 70-35 (Dep. B.Smith at 83-84, 124, 153)).  Smith described Tull Brothers' sealant at the location of the sub-sill back leg as a critical sealant.  (Id. (Dep. B.Smith at 75)).  Smith explained that the window could pass the test "if everything is sealed up very very well…a point of clarification…is that the sealant bead that's shown between the sill member and the subsill that's ….in the shop drawings is intended to be an air seal, not necessarily to be stopping water. That's the reason if it were a taller leg, then…you'd create the air seal, but you wouldn't have to stop the water. It wouldn't have to be a perfect seal. They had to make a perfect seal in order to get this to pass the test."  (Id. (Dep. B.Smith at 830).  Regardless, South Alabama and Elkins directed Tull Brothers to proceed with the installation by using the additional remedial measures developed, in part, by Peerless.  (Id. (Dep. B.Smith at 123)).

On July 20, 2011 Thompson's test results on five (5) windows resulted in a score of "failed" "by allowing water into the interior portion of the window sill within the 15 minute test period.  The window contractor commented that the window manufacturer would be called to

visit the site again to assist in determining the cause(s) of failure."   (Doc. 70-5 at 3). As of July 20, 2011, Tull Brothers had expended 2,896.25 man hours.  (Doc. 70-11).

The failing window test resulted in South Alabama and Elkins requiring Tull Brothers to perform certain remedial work over the following months so that the windows would pass the tests – approximately $579,000 in curative work prior to acceptance.  It is this remedial work for which Tull Brothers seeks reimbursement from Peerless -- as it claims the windows were defectively designed (rather than defectively installed).

Specifically, on August 9th and 10th, 2011, Thompson's test results on eight (8) installed windows – which had recently received a sealant remediation on their interior perimeters – revealed that five (5) of the eight (8) windows failed the test procedure "by allowing water into the interior portion of the window sill within the 15 minute test period."  (Doc. 70-6 at 3).

On September 28, 2011, Dow Bark, one of South Alabama's project representatives (SAG Group, LLC), declared that the Peerless windows were non-conforming and the windows "as originally submitted cannot pass the test."  (Doc. 74-25). "Dow stated that the owners' position on windows is that they are non-conforming[]" and that the "windows have been modified significantly from what was originally submitted in order to pass the test" and the modifications "do not appear in any of the installation guidelines[.]"  (Id. at 1). And while windows have been installed by both Peerless and Tull Brothers, which have passed and failed testing, "there has been a lack of consistency among the installations that can be looked at as the procedure to 'fix' the window and be confident that it would produce a window installation that would effectively pass the testing."  (Id.)  It was noted that the design of the window sub sill was questioned as contributing to the failures, and "we don't know whether the subsill is an issue."  (Id.)  It was noted that Elkins did not agree that the windows are non-conforming.  (Id. at 2).

7

On September 30, 2011, Dow Bark signed a letter advising Elkins that "the installed punch windows are non-conforming as per the contract documents[]" and setting forth a repair methodology submitted by Elkins.  (Doc. 70-35 (Dep. B.Smith at 46); Doc. 74-17).

On October 13, 2011, "Plan B" remediation efforts were reduced to writing to save hundreds of already installed windows; this included hiring a waterproofing contractor to install membrane waterproofing (peel-n-stick) as well as instructions for Tull Brothers.  (Doc. 74-24). Tull was required to implement remedial measures directed by Elkins and South Alabama on this date.  (Doc. 74-12 (Dep. R.Coody at 123-134)).

Tull Brothers asserts that it was in no position to demand a 2-inch back leg "because it did not purchase the windows and because Peerless assured Tull that the windows would adequately perform."  (Doc. 70-37 (Dep. F.Tull at 38-47; Doc. 74-1 (Aff. F.Tull)).  According to Tull, it was not standard in the industry "to make a demand to change the design of a product that it did not purchase."  (Doc. 74-1 (Aff. F.Tull)).

As of November 10, 2011, the parties had agreed to remedial steps regarding the failures of the windows and Elkins concluded specifically, in correspondence to South Alabama, that "we need to guarantee the water stays in the cavity [between the brick and peel and stick] and weeps out[]" to assure it will not enter the building's interior and so "[w]e have coordinated with all parties and have come to the agreement that we will extend the 12" caulk bead, on the interior of the jamb, the remainder of the way up the window."  (Doc. 70-17).

In 2011, Elkins withheld payments to Tull Brothers for the installation work due to the defective windows, and Elkins back-charged Tull Brothers for the costs associated with the Thompson Engineering window tests.  (Doc. 74-1 at 3 (Aff. F.Tull at 3)).

On April 30, 2012, Peerless issued a Commercial Limited Warranty to South Alabama

for three (3) years against defects in workmanship and materials; for five (5) years against material obstruction to vision from dust or moisture collection between the interior glass surface for its insulated glass units; and warranted the anodized finish. (Doc. 70-12). The warranty does not cover failures caused by damage from installation, by not following Peerless' recommended methods of installation, and does not warrant the installation of the windows. (Id.)

On May 4, 2012, South Alabama executed a Limited Warranty Assignment to Tull Brothers. (Doc. 70-13). Per the terms of the Assignment, South Alabama assigned its warranty rights to Tull Brothers, for the sum of $10.00, for the limited purpose of allowing Tull Brothers to pursue claims it may have for any costs and/or losses that it incurred to cure any defects in the windows Peerless supplied "until the date such windows are accepted by USA." (Id. at 2 at ¶2). The Assignment provides further that South Alabama retains all warranty and guarantee rights and did not assign, waive or limit its rights to enforce express or implied warranty obligations owed to it by Peerless to the extent of any cost or losses incurred by South Alabama. (Id. at 2 at ¶3). This Assignment stated that it assigned the entirety of the four (4) page Peerless-South Alabama contract (the Purchase Order) for the windows. (Id. at 1 at ¶1.a.).

On May 16, 2012, Tull Brothers sued Peerless alleging that the Peerless window system was negligently designed and breached the warranty contained in the Purchase Order. (Doc. 1). As of February 25, 2013, Tull Brothers' "total Peerless window cost impact" was **$579,471.65** as follows: 1) $277,068.96 for "total window installation impact" which includes 2,215 "extra" man hours for a total of 3,932 man hours; 2) $61,636.32 for "total administrative & office overhead impact;" and 3) $240,766.37 for "total Elkins Constructors impact." (Doc. 70-26 at 2).

II. <u>**Motions to Strike**</u>[4]

Tull Brothers moves to strike the Affidavit of Coby Jones, a Peerless design engineer, on the grounds that it contains opinions not properly disclosed, opinions outside the scope of expert designations, is not based on Jones' personal knowledge, and contains conclusions not supported by facts. (Docs. 75-76).   The Court did not rely on Jones' Affidavit on summary judgment review and thus, Tull Brothers' motion, which is construed as an Objection, is **MOOT.**

As to Peerless' Objections to portions of the Affidavits of Fred Tull (Paragraphs 10-13) and Chris Beers (Paragraphs 5-7) and any "purported evidence offered to provide that the window system's 1-inch subsill back leg was defectively designed." (Docs. 80-81), the Court finds as follows.  First, Peerless contends that the referenced portions of the Affidavit of Fred Tull is a "sham affidavit" because statements made in same are "perfectly contrary to the contract documents under which Tull Brothers operated." (Doc. 81 at 5-7).

The Eleventh Circuit has articulated the standard for this Court for "sham" affidavits:

> When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony.

<u>Van T. Junkins & Assocs. v. U.S. Indus., Inc.</u>, 736 F.2d 656, 657 (11th Cir. 1984).  Only declarations "inherently irreconcilable" with earlier testimony can be disregarded.  <u>Tippens v.</u>

---

[4] With the December 1, 2010 rules change to Rule 56 of the <u>Federal Rules of Civil Procedure</u>, it no longer appears that motions to strike submitted on summary judgment are appropriate. Revised Rule 56(c)(2) provides that "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."  The Advisory Committee Notes specify as follows: "Subdivision (c)(2) provides that a party may object that material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence. The objection functions much as an objection at trial, adjusted for the pretrial setting. The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated. *There is no need to make a separate motion to strike.* If the case goes to trial, failure to challenge admissibility at the summary-judgment stage does not forfeit the right to challenge admissibility at trial."  Fed. R. Civ. P. 56, Adv. Comm. Notes, "Subdivision (c)" (2010 Amendments) (emphasis added).

Celotex Corp., 805 F.2d 949, 954 & n.6 (11th Cir. 1986).  Not every discrepancy will justify a court's refusal to consider contradictory evidence.  See Lane v. Celotex Corp., 782 F.2d 1526, 1530 (11th Cir. 1986).  An affidavit may be stricken as a sham when it directly contradicts, without explanation, a witness's previous sworn testimony.  See, e.g., McCormick v. City of Fort Lauderdale, 333 F.3d 1234, 1240 n. 7 (11th Cir. 2003).  Peerless does not rely upon or even reference prior sworn testimony by Tull, much less such testimony that is "inherently irreconcilable" with the statements in his Affidavit.  Thus, the sham affidavit doctrine is wholly inapplicable.  As such, Peerless' Objection lacks merit and it is **OVERRULED** as to Fred Tull.

Second, as to Paul Beers, Peerless contends that Paragraphs 5-7 of his Affidavit contain statements which "flies [sic] in the face" of his deposition and contradict the contract documents.  The Court did not rely on Beers' Affidavit on summary judgment review.  Thus, Peerless' Objection as to Paul Beers' Affidavit is **MOOT.**

Third, that portion of the Objection seeking to exclude all affidavits, depositions and the summary judgment opposition brief purporting to assert design defects opinions, is **OVERRULED.**  Peerless bases this portion of its motion on its assertion that expert testimony by a qualified expert witness regarding design defect (as to the window system) is *always required* and that Tull Brothers has failed to provide same.  (Doc. 81 at 8). As grounds, Peerless relies Hughes v. Stryker Corp., 423 Fed. Appx. 878 (11th Cir. 2011).  Hughes is distinguishable and inapplicable.  Hughes is an AEMLD case involving a physical injury.  This is a common law negligent design defect, indemnity, express warranty, and breach of contract case involving purely economic damages (no physical injury and no other property injury), and Hughes itself highlights that "a plaintiff's negligence claim is distinct from a products liability claim under the AEMLD."  Hughes, 423 Fed. Appx. at 881-882.  Additionally, Hughes does not hold that expert

testimony is *always* required for design defect claims under the AEMLD, concluding "expert testimony is not required if the inference 'that the defective condition of the product is the cause of the product's failure and the plaintiff's resultant injury....may be reasonably made from the product's failure of performance under all the attendant circumstances.'"   Hughes, 423 Fed. Appx. at 880.  Moreover, Tull Brothers has expert witnesses in this case.

## III.   Conclusions of Law[5]

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a) (Dec. 2010).   Rule 56(c) provides as follows:

> *(1) Supporting Factual Positions.* A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.
>
> *(2) Objection That a Fact Is Not Supported by Admissible Evidence.* A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.
>
> *(3) Materials Not Cited.* The court need consider only the cited materials, but it may

---

[5] Jurisdiction in this case is based upon complete diversity of citizenship. "[A] federal court in a diversity case is required to apply the laws, including principles of conflict of laws, of the state in which the federal court sits."  Manuel v. Convergys Corp., 430 F.3d 1132, 1139 (11th Cir. 2005) (citing Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941)).   Alabama courts follow the traditional conflict-of-law principles of *lex loci contractus* and *lex loci delicti*.  Lifestar Response of Ala., Inc. v. Admiral Ins. Co., 17 So. 3d 200, 213 (Ala. 2009). Accordingly, in Alabama, contract claims are governed by the laws of the state where the contract was made, unless the contracting parties chose a particular state's laws to govern their agreement, Cherry, Bekaert & Holland v. Brown, 582 So. 2d 502, 506 (Ala. 1991), and the substantive rights of tort claimants are determined according to the laws of the state where their alleged injuries occurred.  Fitts v. Minn. Mining & Mfg. Co., 581 So. 2d 819 (Ala. 1991). While neither party has directly addressed this issue, the parties appear to agree to the application of Alabama law, presumably because the construction project at issue is located (and the contractual agreement related to the order for the windows took place) in Mobile, Alabama.  Thus, the Court will apply Alabama law to all claims.

consider other materials in the record.

> *(4) Affidavits or Declarations.* An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

FED.R.CIV.P. Rule 56(c) (Dec. 2010).  Defendants, as the party seeking summary judgment bear the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  If the nonmoving party fails to make "a sufficient showing on an essential element of her case with respect to which she has the burden of proof," the moving party is entitled to summary judgment.  Celotex, 477 U.S. at 323.  "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter.  Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998-999 (11th Cir. 1992) (internal citations and quotations omitted).

## A.    **Common Law Negligence**

Tull Brothers alleges that Peerless "negligently designed the window system provided pursuant to the Purchase Order[]" due to the presence of a 1-inch back leg (versus a 2-inch back leg) which resulted in the window failures (that the design of the product caused them damage not the product itself).  (Doc. 1 at 3). Peerless contends that Tull Brothers' claim fails because: "[i]f Tull Brothers was unable to duplicate after May 18 what it accomplished to pass the four field tests…then that was a problem with Tull Brothers' installation and quality control, not a

design defect."  (Doc. 69 at 19).

To establish common law negligence, plaintiff must prove: 1) a duty to a foreseeable plaintiff; 2) a breach of that duty; 3) proximate causation; and 4) damage.  See, e.g, Brushwitz v. Ezell, 757 So.2d 423, 432-433 (Ala. 2000).   At the outset, it appears that Berkel and Co. Contractors, Inc. v. Providence Hosp., 454 So.2d 496 (Ala. 1984)[6] governs, such that the economic loss rule[7] does not apply to this case.   Concerning the first two elements for a negligence claim, Tull Brothers' allegations are rooted upon its reliance on Peerless, per the relevant construction contract documents and Peerless' representations, to design the windows correctly so that Tull Brothers could install them properly.  This reliance – and Peerless' duty to Tull Brothers stemming from same -- exists separately from the issue of whether Tull Brothers' is in privity as to Peerless.  "[D]efendant's duty may arise from a social relationship as well as from a contractual relationship…'Although plaintiff may be barred from recovering from defendant as a third party beneficiary to defendant's contract with another, plaintiff may nevertheless recover in negligence for defendant's breach of duty where defendant negligently

---

[6] In Berkel the subcontractor encountered considerable difficulties installing the pilings in the manner specified in the original plans and presented evidence indicating that those specifications were defective. The Berkel Court concluded that, when the owner of the project site and architects changed specifications and directed continuation of the work, the owner owed a duty to the subcontractor for expenses incurred by the subcontractor in performing the work under the original plans. 454 So.2d at 500, 503.

[7] The economic loss rule prevents recovery in tort when a defective product has resulted in the loss of value or use of the thing sold and/or the cost of repairing it – i.e., when a product damages itself but does not cause personal injury or damage to any other property than itself.  See, e.g., East River S.S. Corp. v. Transamerica Delaval, Inc., 476 U.S. 858, 870 (1986) ("since by definition no person or other property is damaged, the resulting loss is purely economic. Even when the harm to the product itself occurs through an abrupt, accident-like event, the resulting loss due to repair costs…is essentially the failure of the purchaser to receive the benefit of its bargain-- traditionally the core concern of contract law[]"); Lloyd Wood Coal Co. v. Clark Equip. Co., 543 So.2d 671, 673 (Ala. 1989) (holding that a cause of action does not arise in negligence when a product malfunctions or is defective, and the malfunction or defect results in damage only to the product itself, and produces only economic loss). "The purpose of the economic loss rule is to prevent contract law from being swallowed by tort remedies. Contract remedies and warranty claims are the proper means to resolve the problems arising from products that fail to perform, either at all or as warranted."  Tuscumbia City School Sys. v. Pharmacia Corp., 871 F. Supp. 2d 1252 (N.D. Ala. 2012).  However, in this case there has been no damage to the product.  Rather, the claim is for the additional costs incurred to install a product that now functions as intended.

performs his contract with knowledge that others are relying on proper performance and the resulting harm is reasonably foreseeable.'" Berkel, 454 So.2d at 501.[8] See also e.g., QORE, Inc. v. Bradford Bldg. Co., Inc., 25 So.3d 1116, 1124-1125 (Ala. Jun. 12, 2009); Cincinnati Ins. Cos. v. Barber Insulation, Inc., 946 So.2d 441, 446–447 (Ala. 2006)). Considering the six (6) factor inquiry,[9] Id. at 503, there are facts to support that Peerless assumed a duty to Tull Brothers (a third party) to act reasonably, knowing that Tull Brothers was relying on its proper performance in order for Tull Brothers to perform its installation job. Moreover, the Court finds that there are issues of fact as to whether Peerless breached this duty. For these reasons, Peerless' motion for summary judgment on Tull Brothers' negligence claim is **DENIED.**

**B.**     **Breach of Express Written Warranty**

Tull Brothers alleges that Peerless breached the express written warranty it provided for its windows – namely, the warranty in the Purchase Order. (Doc. 1 at 4; Doc. 70-9; Doc. 70-13). Tull Brothers contends the windows were non-conforming because they were defectively designed, triggering the express written warranty in the Purchase Order. (Doc. 74 at 26). In response, Peerless contends that said warranty does not apply as there is no evidence that the windows were defective due to a defect in workmanship or material (versus a defective design), and, because the window system passed the May 18, 2011 field tests. (Doc. 69 at 20-21).

Alabama law provides that any affirmation of fact or promise made by the seller to the

---

[8] "[B]y entering into a contract with A, the defendant may place himself in such a relation toward B that the law will impose upon him an obligation, sounding in tort and not in contract, to act in such a way that B will not be injured. The incidental fact of the existence of the contract with A does not negative the responsibility of the actor when he enters upon a course of affirmative conduct which may be expected to affect the interests of another person." Berkel, 454 So.2d at 501.

[9] 1) The extent to which the transaction was intended to affect the other person; 2) the foreseeability of harm to him; 3) the degree of certainty that he suffered injury; 4) the closeness of the connection between the defendant's conduct and the injury; 5) the moral blame attached to such conduct; and 6) the policy of preventing future harm.

buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise, and that any description of goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description. Ala. Code § 7-2-313(1)(a)-(b).  An express warranty need not be made in writing.  See, e.g., Fleming Farms v. Dixie Ag Supply, Inc., 631 So. 2d 922, 924-925 (Ala. 1994).  Here, however, Tull Brothers has specifically limited its warranty claim against Peerless to the express written warranty contained in the Peerless-South Alabama Purchase Order.  As such, the Court's warranty assessment is limited to same.

"A manufacturer's liability for breach of an express warranty derives from, and is measured by, the terms of that warranty." Cipollone v. Liggett Group, Inc., 505 U.S. 504, 525–526 (1992).  The Purchase Order provides that "Seller agrees to warrant goods provided under this order for a period of one year, or such longer period as may be required in the order or the Prime Contract, against *defects in materials or workmanship*."  (Doc. 70-9 at 4 (emphasis added)).  As noted *supra*, the parties' summary judgment arguments (and this case) are not premised on any purported defective materials or workmanship in the Peerless windows, but instead on the windows' allegedly negligent/defective design. The terms of the Purchase Order express warranty do not include a warranty against defective design -- only against defective materials or workmanship.  A written warranty against defects in materials or workmanship does not encompass a warranty against defects in design.  See, e.g., Bruce Martin Const. Inc., v. CTB, Inc., 2012 WL 6203112, *4 (E.D. Mo. Dec. 12, 2012); Horvath v. LG Elect. Mobilecomm U.S.A., Inc., 2012 WL 2861160, *4-5 (S.D. Cal. Feb. 13, 2012).  Tull Brothers' expert states that the windows were "defectively designed" (Doc. 74-1 (Aff. F.Tull at 2)); there has been no evidence presented of defective materials or workmanship.  Thus, summary judgment is due to

be **GRANTED,** as a matter of law, in favor of Peerless with regard to Tull Brothers' express warranty claim.

## C.    Contractual Indemnity[10]

Tull Brothers alleges that as a result of the defective and non-conforming windows supplied by Peerless, it incurred damages (due to the costs it incurred to perform curative work on the windows) for which it is entitled to indemnification from Peerless per the hold harmless provision in the Purchase Order (and via assignment).[11]   (Doc. 1 at 4; Doc. 74 at 27-28).   In response, Peerless asserts that the assignment did not actually assign the hold harmless provision to Tull Brothers; the hold harmless language is limited to defective or nonconforming material and the window system passed the May 18, 2011 tests; and Tull Brothers cannot show that it was "held liable."  (Doc. 69 at 21).

Express indemnity agreements are contractual provisions in which one party to the contract agrees to pay costs incurred by the other party to the contract as a result of the other party being held liable to a third party or having to defend against a claim filed by a third party. See, e.g., Cochrane Roofing & Metal Co., Inc. v. Callahan, 472 So.2d 1005, 1008 (Ala. 1985). To assess the enforceability of an indemnity agreement, courts assess the contractual language, the identify of the draftsman of the language, and the indemnitee's retention of control.  See, e.g., Royal Ins. Co. of Am. v. Whitaker Cont. Corp., 824 So.2d 747, 751 (Ala. 2002).   While particular language in an indemnity agreement is not required, the requisite intent of the parties must be clear; ambiguous language is construed against the drafter.  Id.

As to what was assigned, on May 4, 2012, South Alabama executed a Limited Warranty

---

[10] Tull Brothers has not alleged common law indemnity.

[11] The validity of the assignment has not been challenged.

Assignment to Tull Brothers. (Doc. 70-13). Per the terms of the Assignment, South Alabama assigned its warranty rights *as to Tull Brothers' incurred costs/losses* – but not all of its contractual rights -- to Tull Brothers for the limited purpose of allowing Tull Brothers to pursue claims it may have for any costs and/or losses that it may have incurred to cure any defects in the window materials Peerless supplied. (Id.) The Assignment provides that South Alabama assigned to Tull Brothers its rights and remedies for recovery of the costs/losses in curing the defects with the windows, as provided for under the Purchase Order *including all of the Terms and Conditions thereof* (which sets forth the hold harmless provision):

> 1.    To the extent that it has incurred costs and/or losses in curing any defects with the window materials designated and/or manufactured by Peerless for the above referenced project and sent to USA, USA hereby assigns to Tull Brothers, its rights and remedies for recovery of such costs and/or losses under the following:
>
> a.    USA Purchase Order Number ECS 17-01 included but not limited to the "Terms and Conditions" thereof dated October 27, 2010. *See* attached Exhibit X; B *mss*
> A

(Doc. 70-13 at 2 at ¶1.a). The Assignment thus provides that Tull Brothers was assigned <u>all</u> the Terms and Conditions set forth in the Purchase Order, and thus, the hold harmless provision.

The hold harmless provision -- through which Tull Brothers stands in the shoes of the Purchaser and Peerless stands in those of the Seller -- provides that the "Seller agrees to indemnify and save harmless the purchaser from any and all liabilities, losses, and expenses including attorney's fees, including but not limited to injury to person or property, proximately resulting from the defective or nonconforming condition of the material and equipment purchased on this order to the extent purchaser is held liable." (Doc. 70-9 at 3 at ¶H). Tull Brothers asserts that it has been "held liable" because the general contractor, Elkins, has withheld payments from Tull Brothers as well as "back charged" Tull Brothers for the cost of the water field testing conducted by Thompson. (Doc. 74 at 29). This argument is unavailing because the

indemnity provision is simply inapplicable.  At best, these actions by Elkins suggest a *potential for liability some day in another case*, not that liability has been incurred by Tull Brothers.

Found in a variety of contracts, a contractual provision to "hold harmless" is an agreement to indemnify – the promisor assumes liability for all injuries and damages *upon the occurrence of a contingency*, thus relieving another of liability.  See, e.g., Goodyear Tire & Rubber Co. v. J.M. Tull Metals Co., 629 So.2d 633, 639 (Ala. 1993).  See also *Black's Law Dictionary* (9th Ed. 2009) (defining "hold harmless" as "[t]o absolve (another party) from any responsibility for damage or other liability arising from the transaction; INDEMNIFY[,]" and a "hold-harmless agreement" as "[a] contract in which one party agrees to indemnify the other[]").  The contingent term of the hold harmless provision is for Tull Brothers to have been "held liable."  Tull Brothers has submitted no evidence indicating that it has been sued by a third-party and/or that it has had to defend against a claim by a third-party, for the curative work it performed regarding the window installation.  The contingent event then, has not occurred.

Accordingly, Peerless' motion for summary judgment on the contractual indemnity claim (Doc. 68-70) is **GRANTED** because Tull Brothers has not been "held liable" to trigger the hold harmless provision.

## D.    Breach of Contract

Tull Brothers alleges that: 1) it stands in the shoes of South Alabama regarding the Purchase Order and that Peerless breached that contract; and (in the alternative) 2) because the Purchase Order was created for the benefit of Tull Brothers to install the window system, Tull Brothers was the intended third-party beneficiary.   (Doc. 1 at 4-5).   In response, Peerless contends that Tull Brothers lacks privity to the Purchase Order because Tull Brothers was not a party to same, the subsequent Assignment assigned only the warranty rights, and Tull Brothers

was not an intended third-party beneficiary.[12]

The Court first addresses Tull Brothers' third-party beneficiary claim.  Privity is not required for Tull Brothers to be a third-party beneficiary, as this is an exception to the rule that "one who is not a party to a contract or in privity with a party cannot sue for breach of contract." Cook v. Trinity Universal Ins. Co. of Kansas, 297 Fed. Appx. 911, 914 (11th Cir. 2008). See also Dunning v. New Eng. Life Ins. Co., 890 So.2d 92, 97 (Ala. 2003) (holding that standing to sue under a contract requires plaintiff to be in privity or be an intended third-party beneficiary). A party claiming to be a third-party beneficiary of a contract must establish that the contracting parties intended, upon execution of the contract, to bestow a direct, as opposed to an incidental, benefit upon the third party.  See, e.g., Dunning, 890 So.2d at 97; Weathers Auto Glass, Inc. v. Alfa Mut. Ins. Co., 619 So.2d 1328, 1329 (Ala. 1993).  "[W]e look[] to the complaints and the surrounding circumstances of the parties to ascertain the existence of that direct benefit."  Locke v. Ozark City Bd. of Educ., 910 So.2d 1247, 1250 (Ala. 2005).  Specifically, for Tull Brothers to recover as a third-party beneficiary of the Purchase Order, it must show three (3) elements: 1) the contracting parties Peerless and South Alabama intended, at the time the contract was created, to bestow a direct benefit upon Tull Brothers; 2) Tull Brothers was the intended beneficiary of the contract; and 3) the contract was breached.  See, e.g., Bernals, Inc. v. Kessler-Greystone, LLC, 70 So.3d 315, 320 (Ala. 2011).

Turning to the first requisite element, the evidence indicates that the Purchase Order merely acknowledges Tull Brothers' involvement by: noting that the $603,379.00 cost for the window materials was "per TULL BROTHERS Approved version of Peerless Quote" and "Description per Tull Brothers & Per approved submittals & shop drawings."  All invoices were

---

[12] In its Answer, Peerless denied Tull Brothers' third-party beneficiary allegation.  (Doc. 7).

to be sent directly to Elkins and billed to South Alabama "care of the subcontractor – Tull Brothers."   The parties also agreed that Tull Brothers would be responsible for "all material handling and protection of materials upon removal from the truck at final destination."   Tull has not presented any evidence that Peerless intended, *at the time the contract was created*, to bestow a *direct* benefit upon Tull Brothers.   As one of the contracting parties, Peerless' intentions (regardless of what Tull *believes* was intended by South Alabama[13]) preclude Tull Brothers' third-party beneficiary breach of contract claim.   See, e.g., Porter Capital Corp. v. Thomas, 101 So.3d 1209, 1216 (Ala. Civ. App. 2012).   At best, the evidence supports a finding that Tull Brothers was an *incidental* beneficiary to the Purchase Order, as it received an indirect or consequential benefit, *i.e.*, it received the window installation job out of the purchase of the windows.   See, e.g., Interface Kanner, LLC v. JP Morgan Chase Bank, N.A., 704 F.3d 927, 933 (11th Cir. 2013) (noting that an incidental beneficiary acquires "no right against the promisor or the promisee")).   Thus, even after taking the evidence in the light most favorable to Tull Brothers, the Court does not find sufficient evidence that Tull Brothers was either a direct or an intended beneficiary, as opposed to an incidental beneficiary.   See, e.g., Collins Co., Inc. v. City of Decatur, 533 So.2d 1127, 1132 (Ala. 1988). See also Chester Engineers, Inc. v. Sideridraulic Sys., S.p.A., 2011 WL 1475883, *6 (S.D. Ala. Mar. 29, 2011).[14]

     As to Tull Brothers' second claim that, post-assignment, it stands in the shoes of South

---

[13] Tull Brothers asserts that it is "undisputed" that "the only reason that Tull was not a party to the contract is because South Alabama wanted to save on taxes."  (Doc. 74 at 31). Tull Brothers relies upon the Affidavit of its Project Manager James Roach, to assert that the windows were purchased for Tull Brothers to install and: "[a]s a result, Tull was an intended beneficiary of the contract. It had to install the windows supplied by Peerless to South Alabama… Therefore, Tull is an intended beneficiary to the contract and can maintain this action against Peerless for breach of contract."  (Doc. 75 at 31;  Doc. 74-16 at 1 (Aff. J.Roach)).

[14] Because the first requisite element cannot be satisfied, the Court does not address the remaining elements for a third-party beneficiary claim.


Alabama regarding the Purchase Order, this claim is **CARRIED TO TRIAL.**

## IV.    <u>Conclusion</u>

Accordingly, as set forth herein, it is **ORDERED** that Defendant's Motion for Summary Judgment (Doc. 68) is: **DENIED** as to Tull Brothers' negligence claim; **GRANTED** as to Tull Brothers' express warranty claim; **GRANTED** as to Tull Brothers' indemnity claim; and Tull Brothers' breach of contract claim is **CARRIED TO TRIAL.**   Additionally, it is **ORDERED** that Peerless' Motion to Strike (Docs. 80-81) as to Fred Tull is **OVERRULED,** as to Paul Beers is **MOOT**; and as to design defects is **OVERRULED**; and Tull Brother's Motion to Strike as to Coby Jones (Docs. 75-76) is **MOOT.**

**DONE** and **ORDERED** this **18**[th] day of **June 2013.**

/s/ Kristi K. DuBose
**KRISTI K. DUBOSE**
**UNITED STATES DISTRICT JUDGE**